

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1211-13

### VICTOR MANUEL ACOSTA, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE ELEVENTH COURT OF APPEALS
### HASKELL COUNTY

**COCHRAN, J., delivered the opinion of the unanimous Court.**

Appellant, convicted of money laundering after officers found half a million dollars in cash hidden inside the speaker box of his tractor-trailer, argues that the evidence was legally insufficient to prove that the money represented proceeds from the delivery of a controlled substance.[1] The court of appeals–relying in part on a drug-dog alert to the

---

[1] Appellant's sole question for review is as follows:
Whether the court of appeals erred by holding that a dog sniff, positive for some type of controlled substance, of money is sufficient proof to establish that money was proceeds of *delivery* of a controlled substance?

cash–rejected that argument.[2] After reviewing all of the evidence, we agree that the cumulative force of the circumstantial evidence is sufficient to prove, beyond a reasonable doubt, that the cash was the proceeds of the sale of a controlled substance.

I.

On July 9, 2010, at 10:00 p.m., Trooper Brody Moore stopped a Freightliner tractor-trailer truck with a defective light in Haskell County. Appellant was driving the truck, and a passenger was in the sleeper. Appellant said that the passenger's name was "Gus," but he could not recall his last name. Appellant said that Gus wanted to be a truck driver, so he was riding with appellant cross-country. But Gus (whose full name was later determined to be Gustavo Dominguez) had no driver's license. Trooper Moore noted that there were five cell phones in the truck. Based on his training and experience in drug and drug-money interdiction, the trooper recognized a pattern similar to that in other money seizures: a passenger with no driver's license was traveling with the truck driver.

Trooper Moore also pointed out that five cell phones between one driver and an unemployed passenger was "just not normal." He found that the truck's logbook reflected that the truck originated from El Paso and that appellant left Kankakee, Illinois,[3] at 2:00 p.m. on July 8th. Truckers are required to update their logbooks when there is a "duty status

---

[2] *Acosta v. State*, No. 11-11-00226-CR, 2013 WL 4052633 *6 (Tex. App.—Eastland Aug. 8, 2013) (finding legally sufficient evidence to prove that "the currency represented proceeds from the delivery of drugs.").

[3] Kankakee is 60 miles south of Chicago.

change," such as when they stop for fuel or rest. The last entry in the logbook was at 4:00 a.m. in Missouri. Trooper Moore observed that 4:00 a.m. to 10:00 p.m. was longer than a trucker should drive in one sitting.[4] He explained that drivers often do that when they want to avoid detection. Trooper Moore testified that he had experience with drug loads originating in El Paso. The drugs go out from there; the money comes back in. "Drugs go north; money comes south."[5]

Trooper Moore asked appellant if he had anything illegal in the truck. Then he asked if he had any guns, marijuana, cocaine, methamphetamine, or heroin. Finally, he asked, "Do you have any large sums of cash?" Appellant responded "no" to all of the questions, but he broke eye contact when responding to the last one. When Trooper Moore asked for consent to search the truck, appellant granted it. Deputy Winston Stephens arrived to assist in the search.

The two officers hollered when they found what turned out to be $502,020 in currency in a cavity behind the speakers of the truck. The officers then approached appellant and his passenger—both of whom had been cooperative throughout the stop—with guns drawn to

---

[4] When interviewed, appellant said that he had started his trip in El Paso and gone to Oklahoma to pick up a load, which he and Gus took to Illinois. They were returning from Illinois, heading back to El Paso. Appellant also said the truck–titled to Gastelum Produce out of El Paso, but leased by Texas Southwest Transport–had been in his control for the past five months, and that he was the only one who had keys to it.

[5] Trooper Moore testified that a significant amount of drugs originates in Mexico, that he had made three significant seizures of drugs in loads coming from El Paso, and that he had seized money in trucks headed to El Paso.

arrest them for money laundering.  DPS Sergeant Kyle Taylor, a K-9 handler, placed the vacuum-sealed bundles of currency in two new duffel bags and then randomly placed those bags among four other bags that had not been around narcotics.  Sgt. Taylor's yellow labrador retriever, "Woods," was certified to alert on marijuana, heroin, cocaine, and methamphetamine. Woods alerted on the two bags containing currency.

Both men were indicted for money laundering.  Dominguez was found guilty before appellant's trial and sentenced to ten years' imprisonment.[6]  Appellant's defense at trial was that he–unlike Dominguez–was a "blind mule" who never knew that the money (which appellant conceded in final argument was probably drug proceeds) was there.[7]  In rebuttal, Haskell County Sheriff David Halliburton testified that, while he was serving as bailiff in an earlier proceeding, he saw appellant and Dominguez have what appeared to be an amicable conversation. The State used this evidence to argue that appellant was not a blind mule

---

[6] *Dominguez v. State*, ___ S.W.3d ___, 2013 WL 1748810 (Tex. App.—Eastland 2013).

[7] As was summarized by the court of appeals, appellant's defense was that he was a "blind mule" and that Dominguez was the one guilty of money laundering. Trooper Moore acknowledged that he was aware of the term and its meaning: a "blind mule" is an innocent person duped by the drug cartels to transfer contraband without knowledge that he is carrying contraband. Appellant argued to the jury that the evidence only showed that "Gustavo Dominguez" was the person guilty of money laundering: Dominguez was unemployed, was traveling across the country without a commercial driver's license, and was found guilty and sentenced to ten years in prison. Dominguez was the one who wrote a letter to Homeland Security seeking "his" money back. Appellant points out that he made no admissions of guilt, that he denied knowledge of the money when questioned by the officers, that he was gainfully employed, that he had no criminal history, that he had fully cooperated with the officers, that he gave consent to search, and that he hauled a lawful load to Illinois and was returning to El Paso.
*Acosta*, 2013 WL 4052633 at *4.

because, if he had been, he would have been angry at Dominguez. The jury found appellant guilty of money laundering and assessed his punishment at confinement for eight years.

On direct appeal, appellant argued that the evidence was insufficient to show that the currency constituted proceeds from the delivery of a controlled substance. The court of appeals disagreed and cited the amount of money, its packaging, Woods's alert, and the testimony that appellant and Dominguez's behavior and actions were consistent with that of drug-and-money couriers.[8]  Appellant now argues that (1) the court of appeals erred in relying on the dog alert as evidence that the money was proceeds of delivery of a controlled substance, and (2) the evidence is otherwise insufficient to prove such a nexus. We granted review to clarify that such an alert is probative evidence of a nexus and to emphasize that it is the "totality of facts,"–coupled with common sense inferences that can be made from those facts–that may support a finding that seized money is the "proceeds of criminal activity."

## II.

Under *Brooks v. State*,[9] we review the sufficiency of the evidence establishing the elements of a criminal offense under the single sufficiency standard set out in *Jackson v. Virginia*.[10] Under that standard, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential

---

[8] *Acosta*, 2013 WL 4052633 at *6.

[9] 323 S.W.3d 893 (Tex. Crim. App. 2010).

[10] 443 U.S. 307 (1979).

elements of the offense beyond a reasonable doubt.[11]

A person commits money laundering if he knowingly transports the proceeds (cash) of criminal activity (delivery of drugs).[12] Frequently, there is no direct evidence that the cash seized constitutes such proceeds, but a criminal conviction may be based on circumstantial evidence.[13] "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."[14] In such cases, it is not necessary that every fact and circumstance "point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."[15] Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence.[16]

The narrow question before this Court, then, is whether the conclusion that the half a million dollars of cash in appellant's truck was the proceeds of drug trafficking is warranted by the cumulative force of all the circumstantial evidence. Both forfeiture and

---

[11] *Jackson*, 443 U.S. at 318–19; *Adames v. State*, 353 S.W.3d 854, 859–60 (Tex. Crim. App. 2011); *Brooks*, 323 S.W.3d at 912.

[12] TEX. PENAL CODE § 34.02(a)(1).

[13] *Miller v. State*, 566 S.W.2d 614, 617 (Tex. Crim. App. 1978).

[14] *Hooper v. State,* 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

[15] *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

[16] *Booker v. State*, 929 S.W.2d 57, 60 (Tex. App.—Beaumont 1996, pet. ref'd).

money laundering cases are instructive as to what kind of evidence is relevant to show a nexus between money and drug dealing.  Such evidence includes the following: a denial of knowledge of the money,[17] a narcotics-dog alert on the money,[18] the amount of the money,[19] the packaging of the money,[20] the secret storage of the money,[21] the presence of illegal drugs,[22] and the presence of records of drug transactions.[23] Somewhat more controversially, courts have relied on travel on a known drug route[24] and courier profile evidence.[25]  The

---

[17] It has been said, "A large sum of legitimate cash always has one or more proud parents but drug money, once it is seized by law enforcement, is often treated like an orphan child." *United States v. $242,484.00*, 389 F.3d 1149, 1167 (11th Cir. 2004).

[18] *See infra* notes 31-33.

[19] *See infra* notes 35-37.

[20] *See infra* notes 38-39.

[21] *See infra* note 40.

[22] *See Barron v. State*, 746 S.W.2d 528, 531-32 (Tex. App.—Austin 1988, no pet.) (when money was found in locked safe next to methamphetamine, inside house containing operating meth lab, there was sufficient circumstantial evidence to find money was derived from illegal drug sales).

[23] *See In re Two Hundred Seven Thousand Five Hundred Twenty-Three Dollars and Forty-Six Cents*, 536 A.2d 1270 (N.H. 1987) (records of drug transactions and books on money laundering among circumstantial evidence proving link to prohibited transactions).

[24] *See State v. $11,014.00*, 820 S.W.2d 783 (Tex. 1991) ($11,014 was seized from the claimant after a 19-year veteran of the Houston Police Department, who had received special training in the use of drug-courier profiles that aided him in identifying potential smugglers, observed the claimant deplaning from a flight from New York City to Houston, a route frequented by those transporting drugs); *$217,590.00 in United States Currency v. State*, 54 S.W.3d 918, 926 (Tex.App.—Corpus Christi 2001, no pet.) (evidence supporting nexus between the currency discovered in Olvera's tractor and drug activity included testimony of DPS investigators who said that that the facts involved in Olvera's stop were consistent with the methods of transporting profits derived from narcotics sales to Mexico); *Antrim v. State*, 868 S.W.2d 809 (Tex. App.—Austin 1993, no pet.) (nexus evidence included fact that driver was stopped traveling southbound on a highway that was a major drug-smuggling route during his second 48-hour round trip from Michigan to Texas

bottom line: Concealed movement of money is an integral part of the business of drug

trafficking.[26] Sufficient evidence of a nexus may not be found unless the sum total of

in less than 30 days); *Jones v. State ex rel. Mississippi Dept. of Public Safety,* 607 So. 2d 23 (Miss. 1991) (nexus supported by fact that defendant was stopped on his way back from Miami, a known drug trafficking city). *Contra Deschenes v. State*, 253 S.W.3d 374, 381 (Tex.App.—Amarillo 2008, pet. ref'd) (declining to give "expert" testimony that "[a] lot of the proceeds from the drugs that are shipped to the east come back westbound to . . . the originator who sent the drugs" any probative value on question of whether defendant's money was proceeds of criminal activity); *United States v. Ten Thousand Seven Hundred Dollars and No Cents in United States Currency*, 258 F.3d 215, 227 (3d Cir. 2001) ("[C]laimants' travel route is a minor consideration in the overall probable cause analysis, as travel on I-295 through Delaware is not an occurrence so 'out of the ordinary' as to be even marginally suggestive of claimants' present involvement in the drug trade."). *See also United States v. Beck*, 140 F.3d 1129, 1138 & n. 3 (8th Cir. 1998) (cataloguing, skeptically, whole states and cities identified by law-enforcement officials as a "known drug source").

[25] *See United States v. Foster*, 939 F.2d 445 (7th Cir. 1991) (finding no error in the admission of profile evidence as evidence of guilt).  Some courts have reasoned "that the use of profile evidence to indicate guilt creates too high a risk that a defendant will be convicted not for what he did but for what others are doing, and that at the same time there are many inconsistencies in the profiles themselves." Jay M. Zitter, Annotation, *Admissibility of Drug Courier Profile Testimony in Criminal Prosecution*, 69 A.L.R.5th 425 (1999). This court held exactly that in *Valcarcel v. State*, 765 S.W.2d 412 (Tex. Crim. App. 1989) in which "the Texas Interstate 40 Drug Courier Profile" evidence came in–over Rule 401 and 403 type objections–via an Officer Williams who "had absolutely nothing to do with the arrest of either [defendant], or the search of their automobile." *Id.* at 416.  We held that it "was irrelevant to any issue that was then or later before the jury to decide, and was inherently prejudicial to the right of appellants to receive a fair and impartial trial before the jury." *Id.* at 418.  The Fifth Circuit, too, has held that courier profile evidence is inadmissible to prove substantive guilt based on similarities between defendants and a profile.  *United States v. Morin*, 627 F.3d 985, 995 (5th Cir. 2010) ("[T]here is a fine but critical line between expert testimony concerning methods of operation unique to the drug business [which is permissible], and testimony comparing a defendant's conduct to the generic profile of a drug courier [which is impermissible]." ) (citation omitted).

[26] *See Tran v. State*, 963 So.2d 1, 12 (Miss. Ct. App. 2006), *aff'd,* 962 So.2d 1237 (Miss. 2007) ("The plan in which Tran participated effectively removed the funds from someone's hands and concealed someone's ownership and control of the funds. The movement of these funds to Texas, as a part of the cycle of the drug trade, was necessary because narcotics traffickers cannot actually go to a bank, deposit proceeds from narcotics trafficking, and pay a supplier. Thus, the concealed movement of the funds was an integral part of the business of the drug enterprise. Additionally, Tran's method of carrying out his mission included hiding or concealing the funds in the gas tank and packaging the money to conceal it from drug dogs.").

incriminating facts would allow a reasonable trier of fact to find, beyond a reasonable doubt, that the property (cash) was exchanged for drugs.

III.

The court of appeals held that the evidence was sufficient to support a finding that the half a million dollars of cash was proceeds from the delivery of drugs based on:

- the large amount of cash–which would purchase a first-degree felony amount for drugs such as marihuana, cocaine, methamphetamine, or heroin;

- the currency's being in vacuum-packed bundles designed to avoid detection by a drug dog;

- the drug dog's alert to narcotics on the two vacuum-packed bags;

- courier profile evidence, including Trooper Moore's testimony that a significant amount of drugs originate in Mexico, that he had made three significant seizures of drugs in loads coming from El Paso, and that he had seized money in trucks headed to El Paso; and

- the amicable conversation between appellant and Dominguez seen by Sheriff Halliburton while he was serving as bailiff.[27]

Appellant takes issue with the court of appeals's reliance on the positive canine alert to the money. He cites *Winfrey v. State*, a case in which we hinted at the lack of scientific foundation of human-scent discrimination lineups in which dogs differentiate among human scents in a "scent lineup."[28] Noting that dog "scent lineups" are different from tracking and narcotics detection, we held that "scent lineups," when used alone or as primary evidence,

---

[27] *See Acosta*, 2013 WL 4052633 at *6.

[28] *Winfrey v. State*, 323 S.W.3d 875, 876-78 (Tex. Crim. App. 2010).

are legally insufficient to support a conviction.[29]  Though we have not addressed the issue head on, there is some authority that such dog "scent lineups" are not reliable and should be excluded.[30]

Appellant's reliance on *Winfrey* is, however, misplaced. A drug-dog alert to the scent of narcotics on money is widely accepted in Texas as circumstantial evidence of a nexus between the money and drugs.[31] It is also accepted by other state [32] and federal courts.[33]

---

[29] *Id.* at 883-84.

[30] *State v. Smith*, 335 S.W.3d 706, 716 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (presuming that the dog "scent lineup" field was a legitimate area of expertise, but holding that the State failed to carry its burden in establishing the reliability and relevancy of the deputy's testimony; "In excluding Deputy Pikett's testimony as being unreliable, the trial court could have concluded that there was too large of an analytical gap between the data offered and Deputy Pikett's proffered opinion."); *State v. Dominguez*, ___ S.W.3d ___, 2011 WL 3207766, *10 (Tex. App.—Houston [1st Dist.] July 28, 2011, pet. ref'd) ("We hold that the trial court, in suppressing Deputy Pikett's testimony, reasonably could have concluded that his opinion was not reliable because of the inadequacies in his protocol, training and methods, and lack of oversight and verification of his test results.").

[31] *See Lee v. State*, 143 S.W.3d 565, 569 (Tex. App.—Dallas 2004, no pet.) ("Pham's statement that the source of the money was from the sale of ecstacy, the positive reaction by the drug dog to the bag, the suspicious bundling and denominations of the cash, and the lack of any evidence to support the vacation account of appellant" all support the nexus between the cash and the delivery of a controlled substance); *$27,877.00 Current Money of United States v. State,* 331 S.W.3d 110 (Tex. App.—Fort Worth 2010, pet. denied) (evidence supporting substantial nexus between cash police officers found and defendant's sale of controlled substances included "positive alert from narcotic-detecting canine on the money after it was recovered"); *$43,774.00 U.S. Currency v. State,* 266 S.W.3d 178 (Tex. App.—Texarkana 2008, pet. denied) (evidence supporting connection between cash found and defendant's sale of drugs included police dog alert on a hidden compartment). *Contra King v. State*, 254 S.W.3d 579, 584-85 (Tex. App.—Amarillo 2008, no pet.) (court refused to give the dog's alert on the luggage containing the cash probative value because no evidence supported an inference that the odor emanated from the $30,000 cash, rather than the articles of clothing also in the luggage).

[32] *See* Michael A. DiSabatino, *Evidence Considered in Tracing Currency, Bank Account, or Cash Equivalent to Illegal Drug Trafficking So As To Permit Forfeiture, or Declaration as*

In this case, Sgt. Taylor testified that his yellow lab Woods has passed all his certifications and has been trained to alert on marijuana, heroin, cocaine, and methamphetamine. Sgt. Taylor placed bundles of the currency in two new duffel-type bags, and Sergeant Jody Tullos provided four bags that had not been around narcotics. Woods

---

*Contraband, Under State Law—Odor of Drugs*, 116 A.L.R.5th 325 (2004) (collecting cases from twelve states in which "the courts held that an alert by a dog trained to detect the odor of drugs was at least one factor in holding that there was sufficient evidence to uphold the forfeiture of currency found in, or in the vicinity of, a motor vehicle on grounds that the money was traceable to drug dealing, or at least to deny dismissal of the action or summary judgment in favor [of] claimants resisting forfeiture"). *See, e.g., Jacobson v. $55,900 in U.S. Currency*, 728 N.W.2d 510, 528 (Minn. 2007); *Evans v. City of Aberdeen*, 926 So.2d 181, 184 (Miss. 2006).

[33] *See United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448 (7th Cir. 2005) (drug-dog alert to airline passenger's $30,670 in currency was entitled to probative weight); *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001) (dog alert, which linked cash hoard to illegal drug action, is entitled to probative value); *United States v. $67,220.00 in United States Currency*, 957 F.2d 280 (6th Cir. 1992) (alleged reaction of the drug–sniffing dog to the money was probative evidence that the money was involved in drug transactions); *United States v. $215,300 United States Currency*, 882 F.2d 417 (9th Cir. 1989) (canine alert for the presence of narcotics on the seized currency is strong evidence of the currency's connection to narcotics). Some courts, citing studies that a large percentage of all currency is contaminated with the residue of cocaine, either have been unwilling to credit the evidence of a drug dog alert to cash or give it minimal probative value. *See, e.g., United States v. U.S. Currency, $30,060.00*, 39 F.3d 1039, 1042-43 (9th Cir. 1994) (probative value of a dog's alert in Los Angeles "is significantly diminished" because of the evidence of widespread contamination in Los Angeles; reliance on such evidence to separate "'legitimate' currency from 'drug-connected' currency is logically indefensible"). More recently, some courts have rejected the "currency contamination theory," citing evidence that a properly trained drug detection dog alerts only to methyl benzoate, which is a cocaine by-product that evaporates rapidly from the surface of paper currency. *See United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 458–61 (7th Cir. 2005) (dog alerts are triggered by a cocaine by-product, known as methyl benzoate, which is itself "highly volatile and evaporates at an exponential rate from tainted currency, so currency recently exposed to cocaine and returned to general circulation will quickly lose any detectable odor of methyl benzoate, even if the particles of cocaine remain.").
      Sergeant Taylor, when asked on cross-examination in this case about the "cash contamination theory," said that he was aware of the theory, but noted that his dogs–including Woods–have been tested on untainted bank currency and have never alerted to it.

alerted on the two bags containing cash.  This is circumstantial evidence of a link between the $502,020 and a drug deal.

Appellant argues that the "mere fact that the dog alerted to the money" does not itself prove that the money was proceeds of drug delivery and that "a dog sniff without corroboration is insufficient evidence beyond a reasonable doubt concerning this crucial element."[34]  But there was more: The amount of the money, its packaging, and its location together constitute persuasive evidence that the money was related to drug trafficking.[35]

Federal and state courts have held that the sheer amount of cash found is highly probative circumstantial evidence of a link to illegal drug activity.[36]  As the Eleventh Circuit

---

[34] Appellant's Brief at 11.

[35] *See Williams v. State*, Nos. 01–11–00017–CR, 01–11–00018–CR, 2012 WL 2357416, *9 (Tex. App.—Houston [1st Dist.] June 21, 2012, pet. ref'd) (not designated for publication) ("The testimony of Sergeant Luna and Lieutenant Slater indicated that the amount of cash found, the way that it was bundled in thousand-dollar increments, and the way in which it was hidden were indicative of money earned through illegal activity such as drug dealing.").

[36] *$217,590.00 In United States Currency v. State*, 54 S.W.3d 918 (Tex. App.—Corpus Christi 2001, no pet.) ($217,590 would require the sale of approximately 110 pounds of marijuana, which would constitute a felony under Texas law); *$18,800 in U.S. Currency v. State*, 961 S.W.2d 257 (Tex. App. —Houston [1st Dist.] 1997, no writ) (wholesale value of a kilo of cocaine on the streets of that county was between $17,000 and $22,000); *$162,950 in Currency of United States v. State*, 911 S.W.2d 528 (Tex. App.—Eastland 1995, writ denied) (amount of money seized indicated felony amounts of controlled substances); *Antrim v. State*, 868 S.W.2d 809 (Tex. App.—Austin 1993, no pet.) (requisite finding that $301,391 was derived from manufacturing, delivering, selling, or possessing a controlled substance was supported by the amount of money involved); *United States v. $252,300 in United States Currency*, 484 F.3d 1271, 1275 (10th Cir. 2007) (possession of a large amount of currency is "strong evidence" of a drug connection); *United States v. $124,700 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) (possession of $124,700 in cash concealed inside a cooler is strong evidence of a connection to drug activity); *United States v. $242,484.00*, 389 F.3d 1149, 1160-61 (11th Cir. 2004) (en banc) ("The first important fact that lights up the probable cause inquiry with significance is the sheer quantity of cash that Stanford was carrying: nearly a quarter of a million dollars in currency."); *United States v. Mondragon*, 313 F.3d 862, 866 (4th Cir. 2002)

put it,

> A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. Referring to the risk of carrying that much cash around, one of the agents testified, "that's a rather unusual way to transport money, especially in the New York City area, not to take anything away from New York City." Legitimate businesses wire cash between bank accounts or they convert large sums of cash into cashier's checks. . . .
>
> Although the quantity of the cash alone is not enough to connect it to illegal drug transactions, it is a significant fact and weighs heavily in the . . . calculus. As a matter of common knowledge and common sense, legitimate businesses usually do not transport this much cash by couriers. The same is not true of drug rings, which commonly do utilize couriers to transport in cash their ill gotten gains, which can be huge. The district court put it nicely: "One would be hard-pressed to encounter a dealer in narcotics who accepted a personal check or a credit card payment."[37]

But a dealer in narcotics would happily accept half a million dollars cash. Common sense tells us that a law-abiding truck driver does not carry half a million dollars in cash up and down the highways of Texas in his Freightliner truck.

Second, packaging, especially that designed to fool the nose of a drug dog, is potent

---

(presence of $500,000 sealed in 15 plastic bags in car "could raise a suspicion that someone was up to no good, but without more it does not suggest a connection to drug trafficking"); *United States. v. Ten Thousand Seven Hundred Dollars and No Cents in United States Currency*, 258 F.3d 215 (3d Cir. 2001) (the amount of money in a claimant's possession, and the method of packaging, can constitute probative circumstantial evidence that the currency itself is connected to illicit narcotics transactions); *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 285 (6th Cir. 1992) ("[C]arrying a large sum of cash is strong evidence of some relationship with illegal drugs."); *United States v. $38,600.00 in U.S. Currency*, 784 F.2d 694, 698 (5th Cir. 1986) ("a large amount of money" characterized "persuasive circumstantial evidence" of connection between money and illicit drug activity).

[37] *$242,484.00*, 389 F.3d at 1161 (citations omitted).

evidence from which it can be inferred that a nexus exists between money and drug activity.[38]

The packaging in this case–vacuum sealing–is widely regarded as indicating a conscious desire to prevent detection by drug dogs.[39] Trooper Moore–who has specialized training in drug interdiction–testified that the money is "vacuum-sealed" by narcotics traffickers for two reasons: "One would be to make it smaller, to better conceal it . . . . And two, to avoid detection from a [drug dog]." Deputy Winston Stephens, also trained in drug interdiction, stated that drug dealers "vacuum-seal it to cover the scent of narcotics . . . ." Evidence that the $502,020 was vacuum-sealed is strong circumstantial evidence of a link between that money and drug trafficking. Here, as appellant aptly points out, there are no admissions, no

---

[38] *State v. $11,014.00,* 820 S.W.2d 783 (Tex. 1991) (evidence of nexus between money and drug trafficking included the way in which the money was packaged and how the money was wadded up and in small denominations); *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 491 (9th Cir. 1997) (collecting cases holding that the nexus between fabric softener and drug trafficking is recognized to be of great probative value); *United States v. $159,880.00 in U.S. Currency, More or Less*, 387 F. Supp. 2d 1000, 1013 (S.D. Iowa 2005) ("Rather than obtain cashier's checks or converting smaller denomination bills into larger ones, Claimants rubber-banded the cash into 21 bundles and put it into a plastic bag placed inside a duffel bag. The Court finds this method of transporting funds provides further evidence that the cash was connected with drug activity.").

[39] *$130,510.00 in U.S. Lawful Currency v. State*, 266 S.W.3d 169, 175 (Tex. App.—Texarkana 2008, pet. denied) (nexus supported by evidence that the large amount of money was shrink-wrapped supporting inference of intent to seal the odor of drugs inside an airtight package); *United States v. Burkley*, 513 F.3d 1183, 1189 (10th Cir. 2008) ("Most of the money was bundled in vacuum-sealed bags, and an expert witness testified that drug dealers often bundle money in this way to make it easier to conceal and transport and to avoid detection by drug-sniffing dogs."); *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 502 (8th Cir. 2004) (vacuum sealing is a "common ploy to mask odors such as might be detected by dog searches"); *United States v. $242,484.00,* 389 F.3d 1149, 1162 (11th Cir. 2004) ("Wrapping cash in cellophane-type material is a technique known to be used by drug dealers to prevent discovery by drug-sniffing dogs."); *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 982 (9th Cir. 2002) ("[C]ellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs.").

drugs, and no prior connection to drugs.  But the question is not what evidence there isn't,

it's what evidence there is.  And here there is evidence of an obvious attempt to prevent the

money's discovery.

Not only was the money vacuum-sealed, it was found in a secret compartment.  Courts

in numerous jurisdictions have relied on evidence of secret storage in finding a money-drugs

nexus.[40]  Trooper Moore's testimony suggested that the secret compartment–the "natural

void" behind the speakers on a Freightliner–is a favorite hiding spot of drug traffickers.[41]

_____

[40] *$43,774.00 U.S. Currency v. State*, 266 S.W.3d 178 (Tex. App.—Texarkana 2008, pet. denied) (presence of secret compartments in a car's interior was consistent with drug trafficking); *Cantu v. State*, Nos. 13-04-146-CR, 13-04-148-CR, 2005 WL 1706507, *1 (Tex. App.—Corpus Christi July 14, 2005, no pet.) (not designated for publication) (evidence supporting money laundering conviction included fact that $48,950 in cash was found hidden in the engine compartment of defendant's car); *United States v. Delgado*, 653 F.3d 729, 737 (8th Cir. 2011) (proof that money amounted to "unlawful proceeds" included fact that defendant had large amounts of unexplained and hidden cash); *Tran v. State*, 962 So. 2d 1237, 1239 (Miss. 2007) (burden to prove that a predicate crime of drug trafficking was committed was met in part by discovery–in gas tank–of $170,040, vacuum-sealed in plastic and aluminum foil). *But see Cuellar v. United States,* 553 U.S. 550, 568 (2008) (overturning money laundering conviction of defendant who was caught attempting to drive to Mexico with $81,000 in proceeds from drug trafficking, which he had packed in plastic bags covered with animal hair and hidden in a secret compartment under his car's rear floorboards). The Supreme Court overturned Cuellar's money laundering conviction because the fact that funds were concealed during transport across the Mexican border did not prove that the defendant knew that the plan to transport the funds across the Mexican border itself was designed to "conceal or disguise the nature, the location, the source, the ownership, or the control" of the funds as required by the text of § 1956(a)(2)(B)(I).  *Id.* at 561-63.  There is no such equivalent language in the Texas money laundering statute.

[41] Trooper Moore testified that he had been trained to search in a manner to catch every natural void, so he knew where to look on the Freightliner.

Q:    Do you typically, when you're searching a Freightliner, look in those speakers?

A:    Yes.

Q:    Why is that?

A:    Because I was trained that that was a good natural void.

Q:    What do you mean by "natural void"?

As the court of appeals noted, this was not a dog-sniff-without-corroboration case. Not only was there evidence concerning the odor, amount, packaging and storage of the cash, other suspicious circumstances showing a drug-money nexus included the following:

- appellant did not know (or would not provide) his passenger's last name–though the two had just traveled across the country and back, and he said that they went to high school together;

- appellant answered "no" to all of the questions that Trooper Moore asked him, but he broke eye contact when the trooper asked him about carrying a large sum of money;

- appellant had been in possession and control of the truck for five months;

- the logbook showed uninterrupted travel on a drug route known for significant seizures of drugs and cash (El Paso to Chicago and back);

- the star-headed screwdriver that fit the screws in the speaker mesh was found in the truck's toolbox, and the screws on the right speaker were heavily tooled;

- appellant did not act surprised when the cash was found;

- there was no apparent legitimate origin for the half a million dollars;

- five cell phones were found in the truck;

- appellant and Dominguez appeared to have an amicable relationship even after their arrest and indictments.

In isolation, many of the facts relied on by the State could be characterized as only somewhat probative of whether appellant's cache of cash was drug-delivery proceeds.[42]

---

A:    Because there's a cavity behind those speakers. You've got a cavity that runs across the whole back wall, towards the roof, and it's a huge cavity.

[42] The unexplained presence of half a million dollars in cash behind a freight truck's stereo speakers is, by itself, extremely suspicious. The larger the sum of secreted cash, the more likely its unexplained presence may be found to be proceeds from criminal activity.

However, we do not consider evidence myopically or point out problems with the individual, separate facts underlying the State's case because all of the evidence–both direct and circumstantial–must be evaluated as a whole by the reviewing court.[43]  As one federal court explained,

> [W]e look to the totality of the circumstances and do not try to pick them off, one by one, by conjuring up some alternative hypothesis of innocence to explain each circumstance in isolation. Finally, and most importantly, we do not take an academic or theoretical approach. Instead, we eschew clinical detachment and use a common sense view to the realities of normal life.[44]

Examining the totality of facts and applying "common experience considerations,"[45] we agree with the court of appeals that the jury could have reasonably concluded that the $502,020 found was–as appellant conceded in closing argument to the jury–"proceeds from the delivery of a controlled substance" as alleged in the indictment.  We therefore affirm the judgment of the court of appeals.

Delivered: May 7, 2014
Publish

---

[43] *Compare Powell v. State*, No. 04–11–00495–CR, 2012 WL 3597199, *4 (Tex. App.—San Antonio Aug. 22, 2012, no pet.) (not designated for publication) (considering totality of evidence to support nexus between money and drugs; evidence included:  the strong smell of air freshener; the odor of marijuana and cocaine emanating from the compartment; the money, covered in Saran Wrap and then duct-taped in the form of bricks; the hidden compartment; and defendant's actions before, during, and after the search) *with Deschenes v. State*, 253 S.W.3d 374, 382-85 & nn. 7-24 (Tex. App.–Amarillo 2008, pet. ref'd) (considering the evidence piecemeal and finding it insufficient to support a nexus between money and drugs; evidence included: a large sum of cash; travel on a known drug route; the packaging of the money; an odor of narcotics on the empty suitcase; the close proximity of the cash to the empty suitcase that presumably contained narcotics at one time; an odor of narcotics on the cash).

[44] *United States v. $242,484.00*, 389 F.3d 1149, 1167 (11th Cir. 2004).

[45] *United States v. $250,000 in United States Currency*, 808 F.2d 895, 899 (1st Cir. 1987).