**AFFIRMED and Opinion Filed January 11, 2022**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-19-00560-CR**

**JOSE DAVID GUTIERREZ, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F-1623201-H**

## MEMORANDUM OPINION

Before Justices Molberg, Goldstein, and Smith
Opinion by Justice Goldstein

Jose David Gutierrez appeals his continuous sexual abuse of a young child conviction. A jury convicted Gutierrez and sentenced him to sixty-five years' confinement. In three issues, Gutierrez argues the evidence is insufficient to support his conviction, he received ineffective assistance of counsel, and the statute that makes persons convicted of continuous sexual abuse of a young child ineligible for parole is unconstitutional. We affirm the trial court's judgment.

## BACKGROUND

In March 2016, Gutierrez was charged by indictment with continuous sexual assault of a young child. The indictment alleged Gutierrez intentionally and

knowingly, during a period that was 30 days or more in duration, committed two or more acts of sexual abuse against M.C., a child younger than 14 years of age, by contacting M.C.'s female sexual organ with his sexual organ and his finger.

At trial in April 2019, M.C. testified she was taken away from her biological parents when she was "about five" and went to live with her aunt, Santos Bonilla, who was married to Gutierrez. M.C. testified that, when she was in "pre-K," Gutierrez called M.C. into a room, took off M.C.'s pants and underwear, took off his pants and underwear, and put his penis inside her vagina. Gutierrez told M.C. not to say anything about the assault or her "brother was going to pay the consequences."

For "about half a year," M.C. lived with her parents again, but she returned to live with Bonilla and Gutierrez and "[n]othing happened for awhile." When M.C. was in third grade, Gutierrez began to "rub his part on [her] part" over their clothes approximately "three times a month" for about six months. "Something changed," and Gutierrez began calling M.C. to his room where he would remain clothed but took M.C.'s pants and underwear off and put his fingers in her vagina. Gutierrez "stopped doing it for awhile," and M.C. entered fourth grade. During "half a year in fourth grade," nothing else happened, but then Gutierrez began taking off his clothes and M.C.'s clothes and putting his penis in M.C.'s vagina. M.C. testified these assaults happened "three times a month."

–2–

When M.C. was in fifth grade, she told Bonilla about the abuse. Bonilla went to talk to Gutierrez, and M.C. "heard they were arguing." After that, Bonilla came to M.C. and "told [M.C.] to not say nothing at school, to not talk about it, because she said that she needed help paying the bills and all that, and she didn't want anyone to know about it."

About a month later, M.C. was taking a math test at school, and she "had this issue that [she] was always going to the restroom." M.C.'s teacher, Marilen Mendez, noticed this and sent M.C. to the nurse. The nurse discovered that M.C. had a high temperature and told M.C. she had to go back home. M.C. "insisted to stay at school."

Mendez approached Nicole Alvarez, the assistant principal, with her concern that M.C. was going to the restroom "every few minutes," and Alvarez learned that M.C. "freaked out a little bit" when she was told her uncle, Gutierrez, was coming to pick her up. A group from the Child Advocacy Center had recently conducted training at the school to help identify signs that "something may be going on at home," and this training was "very fresh in our minds." Alvarez had M.C. come to her office along with Mendez and Coleen Douger, a Garland police officer stationed at the school. M.C. was "petrified" and crying, and Alverez had Douger lead the questioning. In the training, Alvarez learned not to "probe" and to be "very objective" in questioning children about what was going on and let them be the ones to explain what was happening. M.C. said her uncle made her uncomfortable

because he touched her on the shoulder and on the leg and "whisper[ed] things in her ear." When asked how her uncle touched her, Mendez testified, M.C. put her right hand "on her upper thigh and going towards her private parts." Alvarez had Mendez make a referral to Child Protective Services.

The next day, Alvarez called M.C. out of class to speak with a CPS investigator. M.C. did not know that the person was a CPS investigator. M.C. testified that, in response to the investigator's questions about what was going on at home, she "lied because [she] was scared." M.C. clarified that, when she said she lied to CPS, she meant that she did not tell the investigator what her uncle was doing to her. After speaking with the investigator, M.C. returned to class. Later that day, Alvarez spoke with M.C. and asked her if M.C. "had said the truth, and if there was something else [she] needed to say." Alvarez said the investigator was about to leave, and if there was anything else M.C. needed to say, she needed to "say it right now." M.C. "got scared" because she was not telling the truth but she "wanted to say the truth." M.C. was afraid that, if she said something, "a lot of things were going to be changed," and she was afraid that "he was going to do something to me." However, when M.C. saw that Alvarez was "actually worried" about her, M.C. told Alvarez "the truth." M.C. said "someone had touched her," and her "uncle violated [her]." M.C. said "he touched her private parts." M.C. said she did not "tell the lady that [she] spoke to from CPS," and she "hadn't been honest" and "was afraid." M.C. then went with Alvarez to the CPS investigator and "told her."

Garland police detective DeWayne Lewis testified that he and another detective were called to the school following M.C.'s outcry and transported her to the Dallas Children's Advocacy Center (DCAC) for a forensic interview. Jesse Gonzalez, the director of forensic services at DCAC, interviewed M.C., who said Gutierrez had been sexually abusing her beginning when she was five years old and continuing until she was ten. During the interview, M.C. described in detail multiple incidents in which Gutierrez sexually abused her. M.C. said that, during the incidents of abuse, Gutierrez told her Bonilla would not love her, would not forgive her, and would kick her out of the house.

After the interview, M.C. and her brother stayed "three months or four months" with Gutierrez' sister and her three children and Gutierrez' four children. Bonilla visited "every single day," and her behavior was "aggressive and mean." Bonilla asked M.C. "why did [she] tell" and why did she "say to the teachers what was going on when nothing was going on." M.C. testified the other children were also "mean" to her, and the oldest girl said she was going to kill M.C.

After living with Gutierrez' sister, M.C. and her younger brother moved in with their older brother and his wife. Bonilla continued to visit and told M.C. to "take everything back" or Bonilla and M.C.'s cousins were going to hate her.

Approximately two months after her initial interview with M.C., Gonzalez conducted a second interview when M.C. recanted her allegations against Gutierrez. Gonzalez testified that M.C. seemed confused at first about the reason she was there

for a second interview. Gonzalez tried to "prompt [M.C.'s] memory" as to whether M.C. had told someone "she had lied about her uncle." M.C. said her "mom and dad" told her to "say those lies about her uncle," and her father had shown her pornographic videos. M.C. said "that's how she was able to give [Gonzalez] information in the first interview." When Gonzalez asked M.C. to describe the videos in detail, M.C. was only able to indicate that "it was a man and woman having sex, but no details after that." Gonzalez testified that M.C. "was very detailed and gave a lot of information" in her first interview, but she was "very vague" when "exploring certain aspects" in the second interview. Gonzalez did not believe the reasons M.C. gave for making up the allegations of abuse were "sufficient to have given her the information she needed to have said all of those things in her first interview." Gonzalez testified that, in her professional opinion, M.C.'s recantation was "very weak and vague" and M.C. "just kind of seemed confused."

Anna Guzman testified she was M.C.'s therapist from June 2016 to December 2016 at the Dallas Children's Advocacy Center. Guzman testified that, during the course of M.C.'s therapy, M.C. said she was told that if she talked about the abuse no one would believe her, people made fun of her, and no one would love her. M.C. struggled with "the aftermath about talking about the abuse, worrying about her cousins and her family and what that does to a family." Guzman testified that, throughout her therapy, M.C. was "always affirming the abuse by her uncle." Guzman testified she was aware that M.C. had recanted at some point, but she was

–6–

not surprised about the recantation. Guzman explained that "[a] lot of children who don't feel that they have caregivers who are believing or supportive or that children that have been threatened that they're not going to be believed and that no one will love them, will want to take it back." Guzman testified that "disclosure is a process, meaning it doesn't happen just during one single time," and "[r]ecantation is part of the disclosure process." When asked what M.C.'s recantation meant, Guzman answered:

> To me, what that tells me is there were a lot of stressors that the child goes through that would want them -- that would cross their mind about taking something back. So that they, perhaps, felt unsupported. They felt not believed. They felt that it was better to take it back for their safety, their stability, than to say the sexual abuse happened, in that moment.

Guzman testified she did not discuss with M.C. the "specifics of why she may have recanted."

In his defense, Gutierrez called Dr. William Lee Carter, a licensed psychologist. Carter testified he reviewed the forensic interviews, police records, and summaries of the "interviews of all parties involved and the collection of evidence." Carter also reviewed CPS records, medical records, advocacy center records, and counseling records. Carter testified that "to say that a recantation is a part of the disclosure process is an overstatement." Carter testified "the recantation needs to be considered separate and apart from the totality of the disclosure statement." Carter characterized M.C.'s recantation as "more than just a simple recant" and a "very big problem." Carter acknowledged that M.C. came back to

saying her accusations of sexual abuse were true after her recantation, but he testified it would be "interesting" to know "what the child says now about her statements in each of those interviews and where she lands when she makes that ultimate statement." Carter testified he did not interview M.C. or Gutierrez, and he was not present at trial when M.C. testified; however, Carter was "familiar with what her testimony was." At the conclusion of the evidence, the jury found Gutierrez guilty of continuous sexual abuse of a child. This appeal followed.

## DISCUSSION

In his first issue, Gutierrez argues the evidence is insufficient to prove the elements of continuous sexual assault of a child. Specifically, Gutierrez asserts that M.C.'s "recantation impeached her accusation to the point that no rational jury could have found the elements of the crime beyond a reasonable doubt."

A person commits the offense of continuous sexual abuse of a child if, during a period that is thirty or more days in duration, he commits two or more acts of sexual abuse and, at the time of the commission of each act, he is seventeen years of age or older and the victim is a child younger than fourteen. TEX. PENAL CODE ANN. § 21.02(b).

In determining the sufficiency of the evidence, the reviewing court considers the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014).

The jury is the sole judge of the credibility and weight to attach to witness testimony. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The testimony of a child victim alone is sufficient to support a conviction for continuous sexual abuse of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017, no pet.).

In *Owens v. State*, 381 S.W.3d 696, 709 (Tex. App.—Texarkana 2012, no pet.), the defendant was charged with sexually assaulting his four-year-old daughter. The court addressed the complaining witness' recantation, juxtaposing offered reasons for that recantation and context for when the recanting statement was initially made and certain conflicting court testimony with her final testimony making clear that the abuse did in fact occur. *Id.* The court concluded the fact that a witness makes contradictory or inconsistent statements does not destroy his or her testimony as a matter of law. *Id.* (citing *McDonald v. State*, 462 S.W.2d 40, 41 (Tex. Crim. App. 1970)). Here, because reasons and context for the recantation were proffered, in conjunction with clear, detailed trial testimony of the abuse, M.C.'s recantation does not render the evidence insufficient to support Gutierrez' conviction. *See id.*

Gutierrez cites *Bocanegra v. State*, 519 S.W.3d 190 (Tex. App.—Fort Worth 2017, pet. ref'd) to support his argument that the testimony of a victim, standing alone, will not always suffice to support a conviction. In *Bocanegra,* the alleged victim, four years old at the time of the events giving rise to the aggravated sexual

assault charge and seven years old at the time of trial, could not remember at the time of trial any of the events relating to the charge of aggravated sexual assault. *Id.* at 197. In her testimony at trial, the alleged victim "provided no evidence at all" regarding the allegations of sexual assault. *Id.* at 208. In the absence of testimony from the alleged victim, the State relied on a purported outcry statement she made to a nurse examiner. *Id.* at 200–02. Thus, *Bocanegra* is inapposite as M.C. presented detailed testimony establishing Gutierrez committed the charged offense. We conclude M.C.'s trial testimony was sufficient to establish Gutierrez committed the offense of continuous sexual assault of a child. *See Garner*, 523 S.W.3d at 271. We overrule Gutierrez' first issue.

In his second issue, Gutierrez argues he received ineffective assistance of counsel for failing to object to hearsay statements from multiple adult witnesses, other than the designated outcry witness, concerning what M.C. told them about the abuse.

To prove a claim of ineffective assistance of counsel, Gutierrez must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In

–10–

reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006).

Appellant has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the Strickland test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697. Generally, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. However, the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. *Id.*

The record on direct appeal is silent as to trial counsel's strategy and thus insufficient to fairly evaluate whether either prong could be satisfied. Gutierrez' reliance on *State v. Johnson*, No. 05-19-01133-CR, 2021 WL 21701 (Tex. App—

–11–

Dallas Jan. 4, 2021, pet. ref'd) (mem. op., not designated for publication) is unpersuasive as it involved a case challenging the granting of a motion for new trial, after hearing and testimony of trial counsel. While Gutierrez filed a motion for new trial, there were no points of specific error, no hearing, no evidence, and no order. . Based on this record, we cannot say trial counsel's performance was "so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392. We overrule Gutierrez' second issue.

In his third issue, Gutierrez argues section 21.02 of the penal code, the continuous sexual assault statute, "violates U.S. Const. Amend. VIII," contending that under government code section 508.145(a), parole is unavailable to persons serving a sentence under section 21.02. Gutierrez asserts that "the unavailability of parole for a defendant convicted of a violation of section 21.02 is unconstitutional."

Gutierrez failed to preserve this issue for appellate review because he did not raise this complaint in the trial court. *See* TEX. R. APP. P. 33.1(a). A defendant may forfeit the right to complain of an alleged constitutional violation, including the right to be free from cruel and unusual punishment, by failing to object. *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996); *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.). Appellant did not object when his sentence was imposed or raise the issue in a motion for new trial.

Moreover, a panel of this Court has already addressed this issue and determined that the categorical ban on the availability of parole for a person

convicted of continuous sexual abuse of a young child does not violate the Eighth Amendment. *Barroquin-Tabares v. State*, No. 05-15-00794-CR, 2016 WL 3144160, at *3 (Tex. App.—Dallas May 31, 2016, no pet.) (mem. op., not designated for publication). Accordingly, we overrule Gutierrez' third issue.

We affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
190560F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JOSE DAVID GUTIERREZ,
Appellant

No. 05-19-00560-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District
Court No. 1, Dallas County, Texas
Trial Court Cause No. F-1623201-H.
Opinion delivered by Justice
Goldstein. Justices Molberg and
Smith participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.


Judgment entered January 11, 2022