In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00059-CR
_____

CAMERON DONTAE ROBINSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 221st District Court
Montgomery County, Texas
Trial Cause No. 22-01-00130-CR

## MEMORANDUM OPINION

A jury convicted Cameron Dontae Robinson ("Robinson") of the third-degree felony offense of money laundering in an amount between $30,000 and $150,000, and it assessed punishment at four years of incarceration. *See* Tex. Penal Code Ann. § 34.02(e)(2). In eight issues, Robinson complains: (1) that the evidence was legally insufficient to support the verdict; (2) about the admission of certain evidence; and (3) that the cumulative harm resulting from the erroneously admitted evidence

denied him a fair trial. For the reasons discussed below, we affirm the trial court's judgment.

## BACKGROUND AND TRIAL EVIDENCE

On December 31, 2021, Texas Department of Public Safety Trooper John Morris stopped Robinson for driving 102 miles per hour southbound on Interstate 45 in Montgomery County and for committing other traffic violations. During that traffic stop, Trooper Morris located marijuana residue, a gun, and a stack of money rubber banded together in a suitcase in the trunk of the vehicle. Initially, Robinson denied the money was his and said it belonged to his girlfriend, who he had just picked up from Dallas. The money was found in a suitcase with men's clothing, including a red puffer jacket, and a Gucci backpack. A narcotics K-9 alerted on the stack of money. Evidence admitted at trial showed Robinson in possession of an identical jacket and Gucci backpack. Additional evidence admitted at trial established that police arrested Robinson three times within a year of this stop, in possession of a varying combination of (1) vacuum-sealed marijuana, (2) cash rubber banded together, (3) guns, (4) pills classified as controlled substances without a prescription, and (5) digital scales, among other items. A Montgomery County grand jury later indicted Robinson for money laundering and alleged that on or about December 31, 2021, he did "knowingly possess the proceeds of criminal activity, to

wit: possession with intent to deliver a controlled substance, and the value of said proceeds was $30,000 or more but less than $150,000."

**Trooper John Morris's Testimony**

Texas DPS Trooper Morris ("Morris") testified that on December 31, 2021, he observed Robinson traveling south on I-45 at 102 miles per hour, changing lanes without a blinker, and moving in and out of the HOV lane while crossing a double white line. Morris said that Robinson was going almost forty miles per hour over the speed limit, which was noticeable, but generally, drug traffickers do not want to be noticed by police. During Morris's testimony, portions of his bodycam video were admitted into evidence. Minutes into the stop, Morris had Robinson exit the vehicle, because he had trouble hearing Robinson due to passing traffic and wind.

Morris testified that Robinson told him that he was originally from Monroe, Louisiana, recently graduated from college in Pine Bluff, Arkansas, and then moved to Dallas, but Robinson was traveling toward Houston. Morris explained his experience with drug interdiction work and why he was suspicious of Robinson. He testified that Robinson had money falling out of his pocket, he was in an out-of-state car with an out-of-state driver's license, Robinson stated he lived in a separate city and was traveling to the next, which are things Morris looks for. Additional bodycam video admitted during Morris's testimony showed him locating cash and marijuana in the car.

Robinson had about $4,000 in his pocket and told Morris it was not even $10,000. Morris explained this was significant because many individuals they encounter in drug interdiction work believe if they have less than $9,999, the money cannot be seized. Robinson's knowing this was something else Morris noted. Morris testified that someone speeding with $4,000 in his pocket was suspicious and something he put into his "memory bank" with everything else he discovered during the stop.

Morris observed marijuana residue on the vehicle's floorboard, so he asked Robinson if he smoked marijuana. Morris testified that he had probable cause to search the vehicle based on the marijuana residue and that he handcuffed Robinson for "officer safety[,]" given the time of night and Robinson's behavior.

Morris believed there was contraband in the car because Robinson was driving a car with an out-of-state plate, going from one location to the next with an out-of-state driver's license despite living in Texas, and driving from Dallas to Houston. Additionally, Robinson did not want Morris talking to his girlfriend and tried to walk up behind Morris. Morris noticed a large bundle of rubber-banded money in Robinson's pocket. He testified that based on his training and experience, that sum of money along with the marijuana residue in the car suggested illegal drug activity.

Morris also testified that he located a handgun in the car, which Robinson admitted was his. Morris's bodycam video admitted and played for the jury showed

4

him finding the handgun. Other video admitted while Morris testified showed him searching the vehicle's trunk and locating black luggage. Inside the luggage, Morris found a red puffer jacket and tan Gucci backpack, in which he found a pill bottle containing "pills imprinted with RP on one side and 10325 on the other side." Morris testified that the pills were found in a container without a label, "which is indicative of being in possession of illegal narcotics." Morris testified that the DPS lab report later showed the pills were oxycodone, and he never found that Robinson had a prescription.

Bodycam video showed Morris found a "large sum of U.S. currency" in the same suitcase inside the Gucci backpack. During his testimony, photographs of the currency he located were admitted showing the money "rubber-banded together in the individual stacks[,] . . . then those individual stacks are rubber-banded together to each other." Morris said he found $93,971 in cash, including the money in Robinson's pocket. Morris explained that people participating in illegal narcotics activity typically rubber band their money together like this in individual stacks to have easy access to large sums of money without counting it. Morris said that Robinson told him to search the entire car, and Morris did not find scales, baggies, or secret compartments.

For safety reasons, Morris said he eventually moved the investigation from the highway to a parking lot, and bodycam video of the interaction in the parking lot

5

was admitted. In the video, Robinson denied knowing about the money and said it was "my girl's money." Morris testified that Robinson ignored his question about whether the money was legal. He also told Morris that it was his "girl's" suitcase and Gucci backpack. Robinson further told him he just graduated from college and was driving "hot shot," his parents gave him money, and he was a "signed artist" doing rap music for Boosie BadAzz Records but never told Morris it was Little Boosie's money. Morris testified he never uncovered anything while he investigated showing that Robinson was paid as a truck driver or performer but was unfamiliar if rappers were paid in cash. Morris never found anything that showed the money came from a legitimate source. Morris explained that when they moved the scene off the freeway, they called a drug K-9 unit, which hit on the money, indicating the money was involved in illegal drug activity.

Video and photographs of the suitcase that contained the Gucci backpack with the money were admitted during Morris's testimony. They showed contacts inside the Gucci backpack, and Morris testified Robinson wore contacts, but his passenger did not. The Gucci backpack was inside a black suitcase with the red puffer jacket.

A photograph of Robinson's Instagram page was admitted that showed Robinson wearing a red puffer jacket. Morris testified the jacket Robinson wore in the photograph was identical to the jacket he found in the suitcase with the drugs and

6

money. Morris testified that he located cell phones during his interaction with Robinson, and he obtained a search warrant for the cell phone.

Morris testified about a YouTube music video Robinson made under his rap artist name, "Lit Cam," which was posted about two months before the traffic stop. Additional still photographs from the music video were also admitted while Morris testified. Morris testified that the same Gucci backpack from the traffic stop that Robinson claimed was his girlfriend's and contained over $90,000 was in Robinson's music video. Additional photographs from the music video showed marijuana being placed in a cigar, Robinson holding a pill bottle without a label and pouring the same kind of pills Morris recovered into his hand. Another photograph from the music video shows rubber-banded money, which Morris testified meant proceeds from illegal drug activity. Morris testified that in the video, Robinson raps that his friends sell "gas" which is slang for marijuana, and that he turns "a quarter pound into a quarter mill." Morris explained that Robinson was talking about selling a quarter pound of marijuana and making $250,000, essentially that Robinson was saying he makes large sums of money selling drugs.

**Kristen Ross's Testimony**

Kristen Ross ("Ross") is a detective with the Frisco Police Department, but in January 2021, she was assigned to patrol. Ross received a call to locate a black Ford F-150 pickup truck and located it about 12:13 p.m. Ross thought the vehicle was

7

parked, but it started to pull away, so she activated her emergency lights and began a traffic stop. Ross explained that she was responding to a suspicious vehicle call, and she took photos when she conducted the stop. The truck stopped when Ross activated her emergency lights, Robinson was alone inside, and Ross made him exit the vehicle. Ross said that as she approached the vehicle, she observed bullet holes in it and smelled the strong odor of marijuana. Ross explained that the odor of marijuana gave her probable cause, so she searched the vehicle.

The trial court admitted photographs from the Frisco traffic stop into evidence. Ross testified that admitted photographs showed a black .22 pistol found in the driver's door and ammunition found in the magazine, and since she found it while Robinson was committing an offense, it added a charge of unlawful carrying of a weapon. Ross testified that she found a pill bottle containing amphetamine in the driver's door next to the gun. She said the prescription contents matched the label, but the label appeared "to have been tampered with[.]" She also found an empty pill bottle without a label that contained residue. Ross explained they charged Robinson with possession of a controlled substance since that pill bottle was not prescribed to him, and with unlawfully carrying a weapon.

Ross described finding men's clothes, a Gucci backpack, and a red puffer jacket in the back seat. Additional photographs admitted by the trial court during Ross's testimony showed these items, which Ross discussed. Ross testified they did

8

not find drugs, a large amount of cash, or anything illegal in the suitcase. Nothing inside the truck revealed it was a drug trafficking vehicle. Ross reiterated that Robinson was driving the truck with the Gucci backpack and red puffer jacket inside when she stopped it. Looking at a photograph, she testified the Gucci backpack from the December 2021 stop appeared to be the same one found in her stop. She also testified that if Robinson said the Gucci bag was not his, it would be a lie. Ross agreed that rubber-banded money alone does not mean that it is drug money.

**Adam Williams's Testimony**

Adam Williams ("Williams") is a Hunt County Sheriff's Deputy who patrols and previously worked in drug interdiction. He estimated he participated in hundreds of drug trafficking stops. Williams described the flow of drugs and money in narcotics trafficking generally. He explained drugs arrived from the south, flowing south to north and eastbound, whereas the proceeds would flow westbound, and north to south. Williams testified that many drugs come from Mexico into "hub cities" like Houston, San Antonio, Austin, and Dallas. Williams recognized I-30 as a major trafficking corridor.

In distinguishing between personal use and trafficking, Williams looked at the amount involved and the packaging, which is sometimes vacuum-sealed to conceal the scent from K-9s. He has also found large amounts of cash in trafficking cases. Williams testified the money varies in denomination and depends on the

transaction's size. Williams said that during these stops, they often find guns to protect the suspects who are trafficking the narcotics.

In April 2021, about eight months before this arrest, Williams encountered Robinson while working interdiction when he initiated a traffic stop on I-30 eastbound. Robinson was alone in the vehicle. Williams stopped Robinson for speeding, and when he approached the vehicle, he smelled marijuana coming from the vehicle. Williams explained that marijuana is illegal in Texas, and with that smell, Williams suspected there may be marijuana inside the vehicle. Williams asked Robinson whether he had smoked any marijuana, and Robinson said he smoked inside the vehicle earlier that day. Williams testified that he searched Robinson's vehicle and photographed its contents.

During Williams's testimony, the trial court admitted a photograph of the vehicle's contents. Williams testified the photograph showed "multiple vacuum-sealed packages of marijuana[,]" multiple pill bottles with white pills believed to be oxycodone, digital scales, and a stack of U.S. currency. He described the vacuum-sealed packages as "for-sale" rather than for personal use given "[t]he large quantity and the packages being vacuum-sealed to help conceal smell in transport." Williams explained that "[w]hen located with narcotics, scales are commonly used to weigh narcotics for sale and distribution." Williams testified the money removed from the car was in different denominations, consistent with different sizes of marijuana

10

transactions. Williams stopped Robinson traveling eastbound on I-30, and Williams was unsurprised to find that amount of marijuana traveling that direction, since it aligned with how drugs moved through the state.

His report did not say whether the money was found on Robinson's person or in the vehicle, but Williams believed he found it in the vehicle. Williams testified the money was rubber-banded but did not recall how it was broken down. They did not file money laundering charges for the April 2021 stop. Williams knew the prescription pills he found were not in Robinson's name. He did not know where the charges from Robinson's arrest stood.

**John Pryor's Testimony**

John Pryor ("Pryor") is an Arkansas State Trooper. He testified that since 1998, he handled about 1,000 drug cases, including some personal use amounts and other "for-sale" type cases. Pryor explained that usually narcotics for sale are packaged in individually usable amounts of maybe a gram or two, but when you get over that amount, "you are getting into the sale and distribution." He has seen drugs vacuum-sealed, and sometimes, they are trying to hide the smell; they can be sealed like that in pounds depending on how the sellers are distributing.

Pryor said sometimes they find people with large amounts of narcotics with cash, depending on whether they are transporting, bringing cash back, picking up, or delivering. The money is usually in different denominations with "a lot of

twenties, tens." Pryor testified they commonly found people trafficking narcotics with firearms to "protect their product and protect themselves[]" if they are carrying large amounts of narcotics and cash.

In mid-January 2022, while working, Pryor briefly came across Robinson. A local police officer called and wanted his help on a traffic stop searching a vehicle with a strong odor of marijuana. When Pryor arrived, he saw Robinson was in a Dodge Challenger stopped by the officer, so Pryor "initiated" his lights. Robinson was still in his car, and the other officer was in his unit waiting for Pryor. As Pryor activated his lights and approached the other officer, the other officer began explaining why he stopped the vehicle and wanted to search it. As he did, Robinson fled in the vehicle, so they ended up in a "small pursuit" before Robinson wrecked. Robinson then fled on foot, and the other officer chased him but could not locate Robinson that day.

They secured the vehicle, and Pryor searched it on-site. The trial court admitted a photograph of the vehicle's contents. Pryor described the photograph as showing a pound of sealed marijuana, about $6,000 in cash, a thirty-round empty magazine, and another magazine containing unspent rounds. Pryor believed that amount of marijuana was for delivery rather than personal use. Pryor found the $6,000 in the center console in different denominations and testified the money plus marijuana provided possession "with intent[.]"

12

Pryor described Arkansas as having a "hybrid" model for marijuana's legality but explained that the marijuana Robinson possessed was not legal since there was no label, and it was too much to come from a dispensary. He opined that it was illegal and marijuana rather than hemp. Pryor did not believe Robinson would flee if it was legal.

Pryor did not remember whether the money they found was banded, and he was unaware of money laundering charges being filed, but explained it was not his case. Pryor did not know the Arkansas case's status but noted the money was seized and forfeited.

**Jeff Chappell's Testimony**

Jeff Chappell ("Chappell") testified that he works as an investigator for the Montgomery County District Attorney's Office. He has worked there for a year, but he previously worked for eighteen years as a special agent in the Department of Homeland Security assigned to the cyber investigative unit and computer forensics. In the DA's office, Chappell is assigned to the digital forensic unit and performs digital forensics, among other things. Based on his experience as a border patrol agent, Chappell testified that drugs typically flow from Mexico into the U.S. and other countries, and money flows back from the U.S. toward Mexico.

He described his specialized training in cyber investigations, computer forensics, and cell phones. Chappell has taught others how to analyze cell phones

13

and estimated that he has examined "well over 1,000" cell phones. Chappell explained how he performed extractions. He testified, "An extraction is all readable data off of a device. We can't just pick and choose what we want[,]" and that they "will process that copy or that extraction to search for any evidence or anything else involved in the case." Once the search and seizure of the phone is complete, in most cases, they work with the data extracted from the phone.

Chappell explained that one of his colleagues performed the phone extraction in this case, but she was out with health issues. Since his colleague was unavailable, Chappell reviewed her extraction and formed an independent opinion about its contents. Chappell testified that his colleague has been trained to perform cell phone extractions and estimated she had performed hundreds.

Chappell identified the cell phone in this case and explained how he verified it was the correct extraction for that phone. Chappell identified the Cellebrite Physical Analyzer report regarding image or graphic files and testified how he verified the information. Specifically, he reviewed the reports provided and "then went back and processed the actual extraction and matched that up to the reports to verify that it was good and then did as much of a search that [he] could in the time frame that was allotted[.]"

Defense counsel took Chappell on voir dire, and he testified that his colleague's report was valid, and his conclusions were "the exact same." Chappell

testified that State's Exhibits 27 through 57 are images described in State's Exhibit 26 (the Extraction Report) and that he verified were on Robinson's cell phone device, and the trial court admitted the exhibits. Chappell testified the images were from Robinson's phone and showed marijuana under various brand names with prices for different quantities. Chappell said that two photographs admitted showed Robinson holding a large quantity of what appears to be cash bundled with rubber bands. He described another photograph showing a "medium" quantity of blue pills and another photograph that appeared to be a discussion of a drug transaction. Chappell explained Robinson's phone had more data related to drug transactions, and within the SnapChat messages, he "read several things related to someone requesting to purchase marijuana." Even so, Chappell testified they could not download certain parts of the phone, like Apple iMessages, since they were "encrypted," and they did not have a passcode.

Despite searching for location data in the phone, some of that information was encrypted, and he did not see any "longitude or latitude" data, including GPS coordinates showing travel between Houston and Dallas. Chappell testified it was possible that some information about Robinson on this phone downloaded from prior phones in the cloud, which could have existed before this phone was invented, and some data had a created date of at least 2014. Chappell did not find any messages about marijuana on December 30 or 31, 2021. He explained that he "recovered

15

nothing from the iMessaging, Facebook Messenger or any other messaging app, except for SnapChat, because all of that resides on the encrypted portion of the phone." Chappell did not find drug ledgers on the phone but did not specifically look for them. Even so, he said he found images showing large amounts of cash, marijuana, and pills. During cross-examination, Robinson's attorney asked Chappell if he had seen the money, where it was, if anyone ran the serial numbers, and if the money was real, which Chappell did not know.

**Louis Givens's Testimony**

Louis Givens ("Givens") testified that he is a "music manager executive" with "Badazz Music Syndicate." He explained that is a record label based in Baton Rouge, Louisiana, and started by a rap artist named "Boosie," who is his relative. Givens explained that they sometimes give advances to new artists who have a fan base. Givens said payment in the music business comes in different forms including cash, royalties, and wire transfers. Givens said the cash comes from show promoters and from the box offices. Givens testified that they pay artists in cash after shows.

Givens testified that he had known Robinson since 2018 when he became involved with their record label. Givens testified their label signed Robinson to a record contract and distribution contract. Givens testified that he entered into an agreement with Robinson, whose artist name is "Lit Cam," but the contracts the defense offered into evidence were unexecuted, so the trial court excluded them.

16

Givens said they entered into an agreement "on the record side and something on the distribution side." Givens explained that he manages money by ensuring that the artists deliver their required projects and receive the resources they need. They started working with Robinson in 2018, and their agreement with him will continue "until he delivers all his projects."

Givens did not know how much money they gave Robinson in the first agreement, but they usually offer at least $50,000, which would be memorialized in the contract "for the most part." Since then, they entered into three agreements with Robinson, and they make money on the "performance-side" or shows. In 2021, they contracted with Robinson to do three shows. Givens testified that according to the unsigned contract, Robinson was supposed to be paid $25,000 for a show in May 2021, $20,000 for a June 2021 show, and $30,000 for an October 2021 show. He explained that some photographs pulled from Robinson's video showing drug use were used by rappers to depict "the culture." Givens noted that since the 1980s, rap culture pushed "a flashy lifestyle, drugs, you know, things of that nature for the rap business." Givens testified that sometimes, they use prop money in music videos, and other times it was real money; he did not know whether the drugs or money in Robinson's videos were real.

Givens had "no idea" about the source of the money seized from Robinson in December 2021 or if whether it came from criminal activity. He said the contracts

17

were not signed in his presence, but they were signed, and Robinson had done "plenty of shows[]" for them. Givens knew nothing about whether they ever paid Robinson money under those contracts or whether Robinson received money from the shows. Despite being the company's CFO, Givens did not know the "exact" amount they paid Robinson. He also testified they did not have a 1099 for Robinson. Givens did not know where the $94,000 Robinson had in December 2021 came from.

Givens testified that their company CEO is Torrance Hatch a/k/a "Boosie Badazz" but denied Hatch was a drug dealer. In response to this testimony, the State sought to introduce a video of Hatch admitting he was a drug dealer over the defense's objection, which the trial court allowed.

**Additional Evidence**

Along with the above-described testimony and evidence, other evidence admitted at trial included: (1) certified court records for an uncontested civil court judgment forfeiting the funds; (2) photographs obtained from Robinson's cell phone showing marijuana, some with brand names and prices; (3) photographs from his cell phone holding stacks of rubber-banded money; and (4) a music video of Robinson wearing a red puffer jacket like the one found in the car where he raps about turning a "quarter pound" into a "quarter mill" and holding stacks of rubber-

18

banded cash. We discuss this evidence and the trial court's evidentiary rulings in greater detail below, since Robinson challenges its admissibility.

**Motion to Suppress**

Robinson filed a generic pretrial Motion to Suppress, which did not mention the cell phone, and later filed written objections to the warrant authorizing the cell phone search arguing, among other things, that the affidavit was invalid under *United States v. Oglesby*, No. 4:18-CR-0626, 2019 WL 1877228, at *1 (S.D. Tex. Apr. 26, 2019), and *State of Texas v. Baldwin*, 614 S.W.3d 411 (Tex. Crim. App. 2020). Specifically, Robinson argued that "the warrant was overbroad in its description of which categories of data on the cell phone could be searched, as it allowed the police to search the entire contents of the phone, without limitations."

In a hearing before voir dire, the trial court addressed Robinson's objections to the warrant. Robinson stated that "the cell phone warrant was bad." The State responded that although Robinson cited *Baldwin*, which addressed boilerplate language, that case was distinguishable because the cell phone was found four days later, but this one was found in Robinson's possession at the time of the offense when he was in possession of $94,000. Robinson then countered that the warrant was not limited to specific types of cell phone information, thus it was overbroad and constituted a general warrant under *United States v. Oglesby*. Robinson noted that "they applied to search for everything in the phone[,]" and "couldn't point to a

19

specific or a particular item or why they wanted it[.]" The trial court did not rule but told the parties it would have a hearing on the Motion to Suppress after they picked the jury.

The next day, at the hearing on the Motion to Suppress, the defense argued: (1) the affidavit that the search warrant was based on did "not create the sufficient nexus between the cell phone . . . and meeting a probable cause that it would contain evidence of a crime[;]" and (2) the warrant did "not comply with U.S. v. Oglesby in that . . . this warrant authorizes a general search and that it does not limit the search to a particular day. . . [i]nstead it allows access through GPS, social media, messaging, photos, videos, and complete phone contents, thus it is a general search and violates the Fourth Amendment." During the suppression hearing, Trooper Morris testified about the traffic stop and search. He testified that he stopped Robinson for going 102 miles per hour on I-45, and during that stop, he observed marijuana residue. Based on the marijuana residue, Morris said he conducted a probable cause search of the vehicle. Morris testified that during the search, he found a large sum of money and multiple cell phones.

Morris testified that he seized the cell phones and sought a warrant, so they could search the cell phones. Morris testified that a judge signed the warrant in his presence, and an affidavit supported the warrant. The search warrant and affidavit were admitted into evidence for purposes of the suppression hearing.

20

Seemingly relying on Robinson's written objections, the State argued at the suppression hearing that the affidavit demonstrated probable cause to search the cell phones, and this case is distinguishable from *Baldwin*. The State noted this phone was found in Robinson's possession at the crime scene when the crime was committed, and the information to be searched for is set out through his GPS information, where he claimed to be traveling from place to place. The State added that messages, communication, and other data from the phone would help explain whether Robinson was involved in money laundering.

During the suppression hearing, rather than respond to what the State said distinguishing *Baldwin* or point out that Morris failed to provide specific facts supporting probable cause, Robinson answered, that his "biggest contention is related to paragraph No. 4" of the affidavit, which states,

> **THERE IS CONTAINED WITHIN SAID ITEM EVIDENCE OF SAID OFFENSE AND CONSTITUTING EVIDENCE THAT A PARTICULAR PERSON COMMITTED SAID OFFENSE, DESCRIBED AS FOLLOWS:** Data, texts, digital information, photos, images, videos, digital storage devices, records/logs of incoming and outgoing calls and any GPS/location data available, any and all internet searches and other electronically stored data, messages, or images which provide relevant and pertinent information regarding the offense of possession of a controlled substance with the intent to deliver, any evidence that may identify Cameron Dontae Robinson, [Co-defendant], or other potential parties involved in narcotics transactions and money laundering transactions.

21

In the suppression hearing, Robinson argued the affidavit authorized a "general search of the entire phone." He complained that it allowed the government to search and find any available GPS and location data unlimited to any one day. He argued that since it authorized a general search, it failed to meet the *Oglesby* standard.

The State responded that it was impossible to parse data with the available technology, and technology did not exist that allowed the search of a cell phone for partial data. The software program used to extract data downloads everything, then the investigator must review the data to determine what is relevant. Finally, there was no way not to download everything off the phone by a specific day.

Before ruling, the trial court asked Robinson's attorney, "You are just saying this warrant was too broad?" Counsel responded, "Correct." The trial court denied the Motion to Suppress.

## ISSUE ONE: SUFFICIENCY OF THE EVIDENCE

In issue one, Robinson argues the evidence was legally insufficient to establish that he possessed over $30,000 of proceeds from felony marijuana transactions. The State responds that the evidence is legally sufficient if "the cumulative force of all incriminating circumstances supports a defendant's guilt."

**Standard of Review**

In evaluating legal sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine

22

whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Va.*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). "Our review of 'all of the evidence' includes evidence that was properly and improperly admitted." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citation omitted). We measure the sufficiency of the evidence by the offense's elements as defined by a hypothetically correct charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex.

23

Crim. App. 2007). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also Garcia v. State*, 667 S.W.3d 756, 761–62 (Tex. Crim. App. 2023) (citation omitted) ("A proper review of evidentiary sufficiency considers the cumulative force of the evidence.").

**Applicable Law**

As applicable here, a person commits money laundering if he "knowingly . . . possesses . . . the proceeds of criminal activity[.]" *See* Tex. Penal Code Ann. § 34.02 (a)(1). Texas Penal Code section 34.01 defines "criminal activity" as "any offense . . . classified as a felony[.]" *Id.* § 34.01(1)(A). Further, "proceeds" are defined as "funds acquired or derived directly or indirectly from, produced through, realized through, or used in the commission of an act[.]" *Id.* § 34.01(4)(A). The State alleged in the indictment that the criminal activity was possession of a controlled substance with intent to deliver, and the proceeds were $30,000 or more but less than $150,000. *See id.* § 34.02(e)(2).

"Frequently, there is no direct evidence that the cash seized constitutes such proceeds, but a criminal conviction may be based on circumstantial evidence." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) (citation omitted). Circumstantial evidence is as probative as direct evidence to establish an actor's

24

guilt, and circumstantial evidence alone can be sufficient to prove guilt. *Id.* (quoting *Hooper*, 214 S.W.3d at 13). Every fact and circumstance need not "'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Id.* (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)). The trier of fact can use common sense and apply common knowledge when drawing inferences from evidence. *See id.*; *Booker v. State*, 929 S.W.2d 57, 60 (Tex. App.—Beaumont 1996, pet. ref'd).

Relevant evidence to show a nexus between money and drug dealing includes: (1) denying knowledge of the money; (2) a narcotics-dog alert on the money; (3) the money's packaging; (4) the amount of money; (5) secret storage of the money; (6) the presence of illegal drugs; (7) presence of records of drug transactions; (8) travel on a known drug route; and (9) courier profile evidence. *See Acosta*, 429 S.W.3d at 625–26. "Sufficient evidence of a nexus may not be found unless the sum total of incriminating facts would allow a reasonable trier of fact to find, beyond a reasonable doubt, that the property (cash) was exchanged for drugs." *Id.* at 626.

In *Acosta v. State*, the Texas Court of Criminal Appeals explained,

"A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. . . . Legitimate businesses wire cash between bank

25

accounts or they convert large sums of cash into cashier's checks. . . . Although the quantity of the cash alone is not enough to connect it to illegal drug transactions, it is a significant fact and weighs heavily into the. . . calculus."

*Id.* at 629 (quoting *United States v. $242,484.00*, 389 F.3d 1149, 1160–61 (11th Cir. 2004) (en banc)).

**<u>Application</u>**

The evidence admitted at trial established the following: (1) Robinson had over $93,000 in his possession; (2) the money was rubber-banded, and witnesses testified this is common with drug trafficking; (3) he had an out-of-state driver's license and traveled on known drug corridors between Arkansas, Dallas, and Houston; (4) a gun was found in his vehicle; (5) he denied knowledge of the money, which was found in a suitcase containing a Gucci bag and puffer jacket identified as his; (6) a K-9 alerted on the money; (7) there was no legitimate source of the proceeds; (8) he was in possession of oxycodone in an unlabeled pill bottle without a prescription; (9) Robinson had been arrested three times within a year of this arrest while in possession of pills, digital scales, and vacuum-sealed marijuana; and (10) his most recent arrest was less than a month after this one, and he had $6,000 in cash plus a pound of sealed marijuana.

On appeal, Robinson asserts that the money could have come from multiple smaller transactions rather than one large one. "Beyond a reasonable doubt,

however, does not require the State to disprove every conceivable alternative to a defendant's guilt." *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015) (explaining that reasonable hypothesis construct was rejected in 1992). The State was not required to disprove the alternative possibility that the money could have come from many smaller transactions. *See id.*

The "'combined and cumulative force of all the incriminating circumstances'" point to Robinson's guilt, and circumstantial evidence alone may be sufficient to uphold a conviction. *See Acosta*, 429 S.W.3d at 625 (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)); *see also Ramsey*, 473 S.W.3d at 808–09. From the evidence admitted and rational inferences made from that evidence, a jury could reasonably conclude that Robinson possessed proceeds in an amount between $30,000 and $150,000 derived from criminal activity, distributing narcotics. *See* Tex. Penal Code Ann. §§ 34.01(1)(A), (4)(A), 34.02(a)(1), (e)(2). Here, there was "[s]ufficient evidence of a nexus" since the "sum total of incriminating facts" allowed the jury "to find, beyond a reasonable doubt, that the property (cash) was exchanged for drugs." *Acosta*, 429 S.W.3d at 626. Viewing the evidence in the light most favorable to the verdict, we conclude a rational factfinder could find the essential elements of money laundering beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13; *see also* Tex. Penal Code Ann. § 34.02(a)(1). Thus, the evidence was legally sufficient.

27

*See Jackson*, 443 U.S. at 318–19; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13; *see also* Tex. Penal Code Ann. § 34.02(a)(1), (e)(2). We overrule Robinson's first issue.

## ISSUE TWO: CELL PHONE SEARCH AND WARRANT

In his second issue, Robinson asserts the trial court erred in admitting his cell phone's contents because the search warrant affidavit failed to establish probable cause. In support of this issue, he argues that Morris failed to provide "any factual basis to support his belief that appellant's cell phone would contain [ ] evidence." The State responds that Robinson failed to preserve this complaint for our review since his complaint on appeal fails to comport with his complaint in the trial court. We agree with the State.

To preserve error for appellate review, the record must establish the party made the complaint to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. *See* Tex. R. App. P. 33.1(a); *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). No hyper-technical or specific words are required for an objection to preserve an error. *See Vasquez*, 483 S.W.3d at 554; *Clark*, 365 S.W.3d at 339. Rather, the objecting party must let the trial judge know

28

what he wants, why he believes he is entitled to it, and do so clearly enough that the judge understands him at a time when the judge is in a position to do something about it. *See Vasquez*, 483 S.W.3d at 554; *Clark*, 365 S.W.3d at 339. "Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). In analyzing this, we consider "the context in which the complaint was made and the parties' shared understanding at that time." *Id.*

Although Robinson mentioned *Baldwin* in his pretrial filings and the State factually distinguished *Baldwin* during the hearing, Robinson only briefly addressed it during the suppression hearing. He initially complained the affidavit did not create a sufficient nexus creating probable cause that it would contain evidence of a crime. Later during the hearing, he limited his argument saying only that the affidavit was too broad and constituted a general search. When the trial court specifically asked if he was "just saying this warrant is too broad," he responded affirmatively, thus limiting his argument. He did not argue that Morris failed to provide a sufficient factual basis in the affidavit to support his belief that Robinson's phone would contain evidence, the argument he makes on appeal.

In examining the record and considering the context in which the complaint was made and the parties' understanding at the suppression hearing, we conclude that Robinson's complaint in the trial court that the warrant was too broad or

29

"general" does not comport with his complaint on appeal. *See id.* The record of the suppression hearing shows the trial court understood Robinson's complaint to be that the warrant was "too broad" rather than Morris failed to set out sufficient facts in the affidavit, when the trial court was "in the position to do something about it." *See Vasquez*, 483 S.W.3d at 554; *Clark*, 365 S.W.3d at 339; *see also* Tex. R. App. P. 33.1(a). We conclude that by later limiting his argument during the suppression hearing to the warrant being "too broad" Robinson has failed to preserve his specific complaint that the affidavit did not establish a nexus between his cell phone and criminal activity for our review. We overrule issue two.

## ISSUES THREE THROUGH SEVEN: EVIDENTIARY RULINGS

In issues three through seven, Robinson complains that the trial court abused its discretion in admitting certain evidence.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion and must uphold the trial court's ruling if it was "within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). This includes our review of a trial court's decision to admit evidence under Rule 404(b) for an abuse of discretion. *See Dabney v. State*, 492 S.W.3d 309, 318 (Tex. Crim. App. 2016); *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Guevara v. State*, 667 S.W.3d 422, 439 (Tex. App.—Beaumont 2023, pet. ref'd)

30

(explaining that we review the admission of "evidence of other crimes, wrongs, or acts under an abuse of discretion standard."). A trial court abuses its discretion if it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We uphold the trial court's decision if correct on any theory of law applicable to the case even if the trial court states the wrong reason for the correct ruling. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

If the trial court erred in admitting or excluding evidence, then we generally apply the harm standard in Texas Rule of Appellate Procedure 44.2(b), which requires us to disregard any errors that do not affect substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Walters v. State*, 247 S.W.3d 204, 218–19 (Tex. Crim. App. 2007). This is construed "to mean that an error is reversible only when it has a substantial and injurious effect or influence in determining the jury's verdict." *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008) (citation omitted). We will not reverse if we have fair assurance from examining the whole record "that the error did not influence the jury, or had but slight effect." *Id.* (citation omitted).

Evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant. *See* Tex. R. Evid. 401. Rule 403 permits a trial court to exclude relevant evidence "if its probative value is substantially

31

outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* 403. When conducting a Rule 403 analysis, a trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *see also Hall v. State*, 663 S.W.3d 15, 32 (Tex. Crim. App. 2021). Rule 403 favors admitting relevant evidence and "carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010) (citation omitted).

Generally, evidence of a crime, wrong, or other act is inadmissible to show bad character and that a defendant acted in conformity with that bad character. *See* Tex. R. Evid. 404(b)(1); *Perkins v. State*, 664 S.W.3d 209, 216 (Tex. Crim. App. 2022). Still, extraneous-offense evidence may be admissible for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. *See id.* at 404(b)(2); *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003). Extraneous-offense evidence is also

32

admissible to rebut a defensive theory. *See Moses*, 105 S.W.3d at 626 n.4 (noting such evidence is often admitted to rebut a defensive theory). "A defensive theory may be raised through voir dire, opening statements, or cross-examination." *Donald v. State*, 543 S.W.3d 466, 482 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Dabney*, 492 S.W.3d at 318 (opening statements and voir dire); *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (opening statement); *Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1996) (op. on reh'g) (cross-examination). "The trial court's ruling on whether extraneous-offense evidence was admissible to rebut a defensive theory should be upheld if it is within the zone of reasonable disagreement." *Dabney*, 492 S.W.3d at 318. A trial court's ruling is generally considered to fall within this zone if the evidence establishes "1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *De La Paz*, 279 S.W.3d at 344; *Guevara*, 667 S.W.3d at 439. Even if extraneous-offense evidence is admissible for a purpose apart from showing character conformity, the trial court may still exclude it under Rule 403 if the probative value is substantially outweighed by the risk of unfair prejudice. *See* Tex. R. Evid. 403; *see also Moses*, 105 S.W.3d at 626.

## Forfeiture Documents

In issue three, Robinson complains the trial court abused its discretion in admitting evidence of a civil court's default judgment forfeiting the money found in his vehicle with a finding that it was "contraband." In support of this issue, Robinson argues that the documents were irrelevant and unduly prejudicial. *See* Tex. R. Evid. 403. Robinson also contends the documents were inadmissible under Texas Rule of Evidence 408(a)(1). *See id.* at 408(a)(1).

During the defense's cross-examination of Chappell, the following exchange occurred:

Q. Have you seen the money in this case?
A. The physical money?
Q. Yes.
A. No, sir.
Q. Where is it?
A. I don't know, sir.
Q. Has anyone actually gone through and photographed each of the bills and run the serial numbers through it?
A. I wouldn't know, sir.
Q. So we don't even know if the money we are talking about today is real money or fake money?
A. I don't know, sir.

After these questions, the State asked to approach the bench and sought to introduce certified copies of the forfeiture case petition and judgment, arguing that the defense's questions about whether the money was real made the documents relevant as rebuttal evidence. The State asserted that the exhibits document that the money

34

was forfeited and deposited. Robinson objected based on relevance, 403, and 404, among others, and contended that the documents did not prove the money was real, only that it was forfeited.[1] The trial court noted that "it becomes relevant as rebuttal[,]"and "the issue is whether it is currency and it says 'currency' there."

When the defense again questioned the probative nature of the documents, the State responded that it had asked Morris during cross-examination what happens to the seized money, how it was turned over to asset forfeiture, and if the State benefits and gets cars from the money. The State then argued the defense made it relevant by asking Chappell what happens to the forfeited money, and that "counsel by his own questions has made this highly probative." Defense counsel responded that it gives the impression there is a finding against Robinson, which "runs a major risk of confusing and misleading the jury." The State countered that the defense opened the door with its questions.

Rule of Evidence 408(a)(1) governs compromise offers and negotiations. *See id*. 408(a)(1). Rule 408(a)(1) specifies that evidence of "furnishing, promising, or offering – or accepting, promising to accept, or offering to accept – a valuable consideration in compromising or attempting to compromise the claim[]" is inadmissible to prove the validity or amount of a disputed claim. *Id*. Even so, we

---

[1]Robinson's other objections to the forfeiture exhibit included confrontation and hearsay, but he does not raise these on appeal, so we do not address them.

need not address this argument or its applicability to these circumstances, because Robinson failed to raise this objection in the trial court. Accordingly, he has failed to preserve this complaint for our review. *See* Tex. R. App. P. 33.1(a)(1); *Vasquez*, 483 S.W.3d at 554; *Clark*, 365 S.W.3d at 339.

We now turn to Robinson's arguments that the evidence was irrelevant and unduly prejudicial. By questioning whether the money was fake, the defense put at issue the amount seized and whether it was proceeds of criminal activity. The seizure notice and default judgment rebutted a defensive theory that the money was fake. The forfeiture documents established that "$93,971.00" in "U.S. currency" was seized. The evidence was relevant to rebut a defensive theory. *See* Tex. R. Evid. 401, 403.

We now consider whether its probative value was substantially outweighed by the risk of unfair prejudice. *See id*. 403. The probative force of the forfeiture documents was strong and related to the funds seized in this case, as was the State's need for the State to counter Robinson's argument that the money may have been counterfeit. *See Hall*, 663 S.W.3d at 32 (balancing factors); *Gigliobianco*, 210 S.W.3d at 641–42 (same). Any tendency of the evidence to suggest a decision on an improper basis or to confuse or distract from the main issues was low, as this went to the amount of proceeds seized and rebutted any suggestion the money was fake. *See Hall*, 663 S.W.3d at 32; *Gigliobianco*, 210 S.W.3d at 641–42. The jury may

36

have given weight to the forfeiture proceeding finding that the money was "contraband," which goes against its admission. *See Hall*, 663 S.W.3d at 32; *Gigliobianco*, 210 S.W.3d at 641–42. Finally, the evidence took little time to present, since the State submitted it, showed it to the jury in rebuttal, and the presentation of evidence concluded immediately. *See Hall*, 663 S.W.3d at 32; *Gigliobianco*, 210 S.W.3d at 641–42. On balance, the trial court could have reasonably concluded that the probative value of the evidence was not substantially outweighed by the risk of undue prejudice. *See* Tex. R. Evid. 403; *Gigliobianco*, 210 S.W.3d at 641–42; *see also Hall*, 663 S.W.3d at 32.

Since the trial court's ruling falls within the zone of reasonable disagreement, it did not abuse its discretion in admitting the complained-of forfeiture documents. *See Wells*, 611 S.W.3d at 427; *Dabney*, 492 S.W.3d at 318; *Montgomery*, 810 S.W.2d at 391. We overrule issue three.

**Evidence of Extraneous Traffic Stops**

In issues four through six, Robinson complains that the trial court abused its discretion by admitting extraneous offense evidence from three separate traffic stops and what law enforcement found in Robinson's sole possession during those stops. Two of these stops occurred before Robinson's December 2021 arrest in this case, one in January 2021 and another in April 2021. The third stop occurred in January 2022, several weeks after this arrest. Robinson specifically complains of the

37

following evidence the trial court admitted about items found during these extraneous stops: (1) from the January 2021 stop, a pistol and pill bottle containing amphetamine; (2) from the April 2021 stop, marijuana, pills, digital scales, and money; and (3) from the January 2022 stop, marijuana, money, and gun parts. We have outlined the circumstances of these stops in our prior discussion of the trial evidence.

A defensive theory Robinson put forth in his opening statement was that the money seized constituted legitimate proceeds from his career as a "successful rapper[]" and not from "any sort of drug trade." Further, evidence showed that when Morris stopped Robinson in this case, he denied the money was his. Even so, the money was found in a suitcase among items linked to Robinson in other traffic stops and in a music video.

During a pretrial hearing, the trial court first addressed the admissibility of these extraneous traffic stops. The State initially sought to mention the January 2021 Frisco traffic stop in opening statements to show that Robinson was in possession of the same Gucci backpack and red puffer jacket the money was found with in this case to establish ownership and identity. Robinson argued it was more prejudicial than probative under Rule 403. The State responded it was highly probative and substantially outweighed any prejudicial effect since it proved ownership. The trial

court initially allowed the State to mention the Frisco stop in opening but limited it to items linking Robinson to this case.

The trial court next addressed the other two stops. In April 2021, police stopped Robinson in Hunt County, Texas, and the State noted a deputy found about forty pounds of marijuana and cash bundled like in this case. In January 2022, about three weeks after his arrest in this case, Arkansas state police stopped Robinson. They searched the vehicle and found a vacuum-sealed bag of marijuana like the vacuum-sealed bag of marijuana found in the Hunt County stop. The State argued that the stops in Hunt County and in Arkansas, although extraneous, were relevant to the elements of money laundering alleged here: possessing a controlled substance with intent to deliver. The State also asserted that the evidence of these stops related to Robinson's course of conduct between April 2021 and January 2022 to establish that not only did he engage in trafficking narcotics but also profited by laundering the money from the sales. Robinson objected based on Rules 403 and 404 and *Harrell v. State*, 884 S.W.2d 154, 158 (Tex. Crim. App. 1994), arguing that the State must prove the offenses beyond a reasonable doubt, among other things. For opening statements, the trial court ultimately decided that the State could mention only the January 2021 Frisco stop to establish identity, but the court would wait to address the other two offenses during trial.

Later, Ross testified about the January 2021 traffic stop in Frisco, Texas, in which Robinson was the vehicle's sole occupant. During Ross's testimony, the State offered Exhibits 59 through 90, which were photographs identified as items seized during the Frisco traffic stop. Robinson objected to Exhibits 59–62, 65–69, 72, 74, 76–78, and 80–81, arguing that they were more prejudicial than probative and cumulative. He also argued with respect to the photographs of the firearm and pill bottles that in addition to being more prejudicial than probative, they constituted Rule 404 evidence that the State had not proved beyond a reasonable doubt.

The State argued that the trial court must perform a balancing test to determine whether the evidence's probative value was substantially outweighed by its prejudicial effect. The State noted that in this money laundering case, it alleged the criminal activity was possession of a controlled substance with intent to deliver, and particularly, the photos of the pill bottles with labels removed plus a firearm with live rounds, go "directly to the criminal activity that the State has to prove" and its "probative value here is substantial[.]" Additionally, the red puffer jacket and Gucci backpack were found in Robinson's possession during this stop. The trial court excluded State's Exhibits 59, 61, 62, 65, 66, 77, and 80 but admitted the others.

The next day, when the trial resumed, Robinson re-urged his objections to all the pictures and claimed they could mislead or confuse the jury. The trial court noted that the defense claimed the money had nothing to do with criminal activity, he is a

40

successful rapper, and the money comes from legal proceeds, plus the defense claimed he was in college. Additionally, the trial court noted that the State must prove the money is from criminal activity, here, a controlled substance with intent to deliver. The State continued to argue that the probative value must be substantially outweighed by the prejudicial effect. The trial court overruled the defense's objection and admitted the pictures she delineated the previous day. The trial court explained the nature of the charge "lends itself to other things coming in . . . to show intent. . . . what makes it illegal is the scheme."

Witnesses testified that individuals trafficking narcotics for distribution often carry weapons to protect their product, their money, and themselves. Williams explained that digital scales were commonly used to weigh narcotics for sale and distribution. Morris testified that dealers often band their money together. Despite Robinson's contention on appeal that the pills were "not street drugs," amphetamine is a controlled substance, and he did not have a prescription for the substances or labeled bottles that showed they belonged to him. Finally, witnesses testified that drug traffickers often vacuum-seal marijuana to conceal the scent from K-9 detection. The State had to prove the proceeds in this case came from possession of a controlled substance with intent to deliver. *See* Tex. Penal Code Ann. § 34.02(a)(1).

The trial court correctly determined that the complained-of evidence from the three extraneous traffic stops had relevance apart from character conformity, which was to show intent and to rebut defensive theories that the money was obtained legitimately from Robinson's work as a rapper. *See* Tex. R. Evid. 401, 403, 404(b). We turn to the balancing of factors. *See Gigliobianco*, 210 S.W.3d at 641–42. The State's need for the evidence from the three extraneous traffic stops was strong, as collectively, those stops showed possession of narcotics and were relevant to Robinson's intent. *See id.* Particularly, the evidence showed that law enforcement stopped Robinson with quantities of vacuum-sealed marijuana that appeared to exceed personal-use quantities and was packaged in a manner to avoid K-9 detection. The complained-of evidence also included cash, rubber-banded just like it was in this case, found with the narcotics. This weighs in favor of admission. As to the next factor, the evidence of these other stops might tend to suggest a jury to decide the case on an improper basis, yet the trial court instructed the jury in the charge as to what these extraneous offenses could be used for, which included intent, identity, and plan, among other things. *See id.* Since the evidence substantiated the predicate offense, particularly showing intent to deliver, a central issue in the case, the potential for distracting the jury was low, favoring its admission. *See id.* While the evidence may have tended to be given undue weight by the jury, the trial court's instruction in the charge would have mitigated this factor as it told the jury the

42

limited purposes for which they could use the evidence. *See id.* Finally, the last factor weighs against the evidence's admission, as it took time to develop the evidence of these extraneous traffic stops, although the evidence was not cumulative of other evidence. *See id.*

Balancing the probative force of the evidence with using the applicable factors, we also conclude the trial court could have reasonably determined the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403; *see also Gigliobianco*, 210 S.W.3d at 641–42; *see also Hall*, 663 S.W.3d at 32. The evidence from these three extraneous traffic stops over the course of a year was highly probative to establish the requisite intent to deliver a controlled substance and rebutted the defensive theory that Robinson obtained the funds through legitimate means as a "successful rapper." *See* Tex. R. Evid. 404(b)(1).

The combined force of the evidence from a series of multiple traffic stops within a year was highly probative of the State's case as it related to intent and rebutted defensive theories. *See id.* 403, 404(b)(1). Although prejudicial to the defendant, we cannot say that its prejudicial effect substantially outweighed its probative value. *See id.* at 403. The Texas Court of Criminal Appeals has acknowledged the frequent absence of direct evidence in money laundering cases and observed that circumstantial evidence often is critical to proving the offense. *See*

43

*Acosta*, 429 S.W.3d at 625. This case is no exception. Admission of the complained-of evidence fell within the zone of reasonable disagreement, thus the trial court did not abuse its discretion in admitting the complained-of evidence. *See Hall*, 663 S.W.3d at 32; *Gigliobianco*, 210 S.W.3d at 641–42. We overrule issues four through six.

## Video of Robinson's Associate Admitting to Prior Drug Dealing

In issue seven, Robinson complains that the trial court abused its discretion when it admitted a video of Givens, one of his record label business associates, admitting that he had dealt drugs. Robinson complains in his brief that the State improperly tried to impeach Givens on an improper collateral matter when he asked whether the label's founder, also Givens's cousin, dealt drugs. Givens, a BadAzz Music Syndicate executive, testified that the CEO and founder of the record label was Torrance Hatch (aka "Boosie"). As discussed above, the defense's main theory was that Robinson's money came from his rap performances as "Lit Cam," although as the CFO, Givens provided no tax documentation showing how much the record label paid Robinson nor could he say definitively how much they paid him.

During Givens's testimony, the following exchange occurred:

[STATE:] Now, the CEO of your company is Boosie Badazz, right?
[GIVENS:] Correct.
[STATE:] And his birth name was Torrance Hatch?
[GIVENS:] Correct.

44

> [STATE:] So, and Mr. Badazz – in the past he has been a drug dealer, right?
> [GIVENS:] No.

Robinson did not object to the State's question or Givens's testimony. Just after this, the State attempted to show Givens a video where Hatch admitted during an interview to being a "drug dealer" previously while in prison, and the trial court sent the jury out of the courtroom.

Outside the jury's presence, the State played a portion of a video marked as State's Exhibit 106 for Givens. Givens identified the individual in the video as Hatch, and in the video, Hatch admitted that while in prison, he "was a drug dealer." The video lasted about a minute. Givens responded that he only began working with Boosie in 2014 and anything before then, he had "no prior knowledge of that." Still outside the jury's presence, the State offered Exhibit 106, and Robinson objected based on confrontation, hearsay, lack of predicate, and lack of authentication. The trial court admitted the video for the limited purpose of Hatch's statement that he was a drug dealer. When the trial court admitted it for that limited purpose, Robinson objected under Rule 403.

When the State played the video for the jury, Robinson objected based on "optional completeness," but the trial court responded it was not admitting the entire video as evidence. The trial court then instructed the jury that "the trial is about whether or not the crime was committed in this case as indicted in Montgomery

45

County . . . not about Mr. Hatch or Boosie . . . ." Later, in closing, the State alluded to the statement when discounting Robinson's defensive theories, noting, "He has got no legitimate means of income. He says variously that he is a hotshot truck driver, that he is a signed artist by a self-described drug dealer, supported by his parents, he is an engineer. He is all over the place."

We will assume without deciding the trial court abused its discretion by admitting the video where Hatch admitted he dealt drugs. Still, we disregard any errors that do not affect a defendant's substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Walters*, 247 S.W.3d at 218–19. We cannot say that Robinson's substantial rights were affected since we are confident after examining the whole record that the error, if any, "did not influence the jury, or had but slight effect." *See* Tex. R. App. P. 44.2(b); *Taylor*, 268 S.W.3d at 592 (citation omitted). The evidence of Robinson's guilt in this case was substantial, including: being stopped with more than $94,000 in banded cash that testimony showed was "typical" of drug dealers; a K-9's alert on the money; no legitimate explanation for the money; and his denials the money was his despite being found with his possessions. Additional evidence included two other traffic stops before this and one after, where Robinson was found with varying combinations of pounds of vacuum-sealed marijuana, scales, guns, and pills which are also controlled substances, not prescribed to him. Photographs from Robinson's phone showed multiple types of marijuana with brand names and prices.

This complained-of video clip was about one-minute-long depicting Robinson's record label CEO making one statement that he dealt drugs in prison. Considering multiple days of testimony from various witnesses and all the other evidence, it was not significant. Although the State alluded to Hatch's statement in closing, it was in the context of the implausible defensive theories Robinson put forward and was one of several the State dismissed. Further, when the jury saw the video, the trial court instructed them that the trial was not about Hatch, but whether the defendant committed the crime as charged in the indictment. We presume that the jury followed the trial court's cautionary instructions. *See Archie v. State*, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011) ("The law generally presumes that instructions to disregard and other cautionary instructions will be duly obeyed by the jury."). Having determined the error, if any, in the admission of State's Exhibit 106 did not affect Robinson's substantial rights, we overrule issue seven. *See* Tex. R. App. P. 44.2(b); *Taylor*, 268 S.W.3d at 592.

## ISSUE EIGHT: CUMULATIVE HARM

In issue eight, Robinson complains that cumulative harm resulting from erroneously admitted evidence denied him a fair trial. As we have explained in issues three through six, the trial court did not abuse its discretion in admitting the complained-of evidence. We have also determined that the error, if any, in issue seven is harmless. When there is little error or no error shown, there can be no

cumulative harm. *See Buntion v. State*, 482 S.W.3d 58, 79 (Tex. Crim. App. 2016) (noting that "appellant has failed to prove error concerning each of these claims separately, and so we find no cumulative harm[]"); *Murphy v. State*, 112 S.W.3d 592, 607 (Tex. Crim. App. 2003) ("Because we have found little or no error in the above-alleged points, there is no harm or not enough to accumulate."). We overrule issue eight.

## CONCLUSION

Having overruled Robinson's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on May 6, 2024
Opinion Delivered August 28, 2024
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.